1  STEVEN G. KALAR
   Federal Public Defender
2  Northern District of California
   VARELL FULLER
3  Assistant Federal Public Defender
   8th Floor - Suite 820
4  55 South Market Street
   San Jose, CA 95113
5  Telephone:   (408) 291-7753
   Facsimile:   (408) 291-7399
6  Email:       Varell_Fuller@fd.org

7

8  Counsel for Defendant SWEET

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,          Case No. CR 17–00330 LHK

15           Plaintiff,                **DEFENDANT'S SUBMISSION IN
                                        SUPPORT OF CAP REFERRAL AND
16       v.                            SENTENCING MEMORANDUM**

17  MADELEINE MORGAN SWEET,            Court:        Courtroom 8, 4th  Floor

18           Defendant.               Hearing Date:  August 22, 2018
                                      Hearing Time:  9:15 a.m.
19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   INTRODUCTION ................................................................................................... 1

3   BACKGROUND ................................................................................................... 2

4   ARGUMENT......................................................................................................... 3

5   I.    The Base Offense Level Is Correctly Calculated at 10 not 24 ........................................ 4

6   II.   The Court Should Refer This Matter to CAP .................................................. 6

7   III.   The Factors Enumerated in 18 U.S.C. § 3553(a) Support a Sentence of Probation ......... 7

8        A.    The Nature and Circumstances of the Offense Support Probation ......................... 8

9        B.    Ms. Sweet's History and Characteristics Support a Sentence of Probation ........... 8

10             1.    Ms. Sweet's Youth and Her Traumatic Childhood Support

11                a Sentence of Probation ............................................................. 9

12             2.    Ms. Sweet's Substance Abuse History Supports a Sentence of Probation .... 9

13             3.    Ms. Sweet's Extraordinary Post-Offense Rehabilitation and

14                Completion of the Conviction Alternative Program Support a Sentence

15                of Probation ............................................................. 10

16             4.    Ms. Sweet's Mental Health Issues Support a Sentence of Probation ........... 10

17   IV.   Probation Is a Meaningful Punishment ....................................................... 11

18   CONCLUSION ................................................................................................. 12

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Federal Cases

*Gall v. United States*,
552 U.S. 38 (2007) ............................................................................................. 11

*Santosky v. Kramer*,
455 U.S. 745 (1982) ............................................................................................. 9

*United States v. Ameline*,
409 F.3d 1073 (9th Cir. 2005) .......................................................................... 9, 10

*United States v. Booker*,
543 U.S. 220 (2005) ............................................................................................. 8

*United States v. Cantu*,
12 F.3d 1506 (9th Cir. 1993) ........................................................................... 10, 11

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) ............................................................................... 8

*United States v. Fernandez*,
18 F.3d 874 (10th Cir. 1994) .......................................................................... 10, 11

*United States v. Garcia*,
497 F.3d 964 (9th Cir. 2007) ............................................................................... 9

*United States v. Gavin*,
2008 WL 4418932 (E.D. Ark. Sept. 29, 2008) ................................................... 9

*United States v. Serrano*,
No. 04 Cr. 424-19 (RWS), 2005 WL 1214314 (S.D.N.Y. May 19, 2005) ................ 9-10

*United States v. Tzoc-Sierra*,
387 F.3d 978 (9th Cir. 2004) ............................................................................. 10

## Federal Statutes

18 U.S.C. § 3553(a)(1) (2012) ................................................................................. 8

18 U.S.C. § 3553(a)(2)(D) (2012) ........................................................................... 6

21 U.S.C. § 841(b)(1)(C) (2012) ............................................................................. 4

## Federal Sentencing Guidelines

USSG § 2D1.1 ............................................................................................. 1, 4-5

USSG § 5K2.1 ................................................................................................. 11

# INTRODUCTION

Defendant Madeleine Morgan Sweet respectfully submits this memorandum to ask that the Court refer her case to the Conviction Alternative Program (hereinafter "CAP") and defer sentencing until after Ms. Sweet successfully completes CAP. In the alternative, if the Court declines to place her in CAP, she asks that the Court sentence her to 5 years' probation, as recommended United States Probation. Ms. Sweet has pled guilty to possession with intent to distribute, and distribution of, Furanyl-Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). Ms. Sweet has no criminal history, and the parties agree that Ms. Sweet satisfies the requirements of USSG § 2D1.1(b)(7) and is safety valve eligible. Accordingly, Probation correctly calculates an adjusted offense level 6, Criminal History Category I, with an advisory guidelines range of 0-6 months, within Zone A. *See* Presentence Report ("PSR") at ¶ 95. Probation recommends a guideline sentence of five years of probation. *See* PSR, Sentencing Recommendation. The defense anticipates the government will request a custodial sentence based on its guideline calculation. As discussed below, the defense and Probation disagree with the government's guideline calculation because it is includes the weight of the saline solution added to the 1-gm of Furanyl-Fentanyl. As a result, the government's calculation is incorrect and significantly overstates the offense.

Pretrial Services recommends that the Court refer Ms. Sweet to CAP based on its assessment of her eligibility. The defense has no objection to Probation's guideline calculation and sentencing recommendation. The defense further agrees with Pretrial's CAP referral recommendation. Ms. Sweet understands that Probation is recommending probation, but for the reasons discussed below she still asks that the Court place her in CAP. Ms. Sweet asks that the Court consider, among other things, the need to provide the defendant with correctional treatment in accord with 18 U.S.C. § 3553(a)(2)(D).

However, if the Court declines a CAP referral, the defense respectfully requests that the Court sentence Ms. Sweet to probation based on the following: 1) the nature and circumstances of the offense, including Ms. Sweet's crippling opioid addiction during the offense; 2) Ms. Sweet's personal history and characteristics, including her traumatic childhood and familial dysfunction; 3) Ms. Sweet's substance abuse history; 4) Ms. Sweet's impressive post-offense rehabilitation; and 5)

1   recognition that probation is a meaningful punishment.  Based on these factors, Ms. Sweet would ask

2   that this Court sentence her to a five years' probation.

3   **BACKGROUND**

4   Madeleine Morgan Sweet was born in Wichita, Kansas, on February 22, 1989.  PSR ¶ 57.  At

5   sentencing, she will be 29 years old.  *Id.*  She was raised by two hardworking and busy parents who

6   were both physicians.  *Id.*  Ms. Sweet thankfully did not suffer any abuse or neglect in her childhood.

7   PSR ¶ 59.  Nevertheless, her childhood was traumatic.  Her parents' marriage was strained.  PSR ¶

8   60.  They argued and her mother coped by abusing alcohol.  *See* PSR ¶¶ 60, 98. Her parents also

9   struggled to deal with Ms. Sweet's mental health issues, including her acute ADHD and anxiety

10  disorder.  As a teenager, she was prescribed Adderall and started doing well in school.  *Id.*  However,

11  she also began binge drinking and abusing drugs.  PSR ¶ 61.

12  Ms. Sweet had her first drink at age 12 or 13, and r first got drunk at age 13 or 14.  *See* Mental

13  Health Evaluation of Dr. Vivek Dattta, M.D., M.P.H. (hereinafter "Datta Rpt."), filed and submitted

14  under seal as Exhibit A, at 10.  When Ms. Sweet was 14, her father was arrested for domestic

15  violence after he attempted to stop Ms. Sweet's mother from physically assaulting her.  PSR ¶ 61.  At

16  the time, her mother was drunk.  Also at 14, Ms. Sweet got in trouble for drinking alcohol, and was

17  hospitalized for four days on a psychiatric hold.  PSR ¶ 73.  Tragically, in her senior year of high-

18  school, Ms. Sweet was raped.  PSR ¶ 62.  Although she was intoxicated, she remembers saying no,

19  and that others at the party knew it was happening and did nothing to help her.  *Id.*  She never told

20  anyone because she was ashamed and because her perpetrator came from a wealthy family.  PSR ¶

21  63.  She certainly did not tell her mother, with whom she had a very strained relationship, because

22  she thought her mother would not believe nor support her.  PSR ¶ 63.  Despite her struggles with

23  substance abuse, she did well academically, graduating from high school in  2007 and attending the

24  University of Portland from 2007 to 2011.  PSR ¶ 82.  She later graduated from college with a B.A.

25  in political science and French studies.  In 2011, Ms. Sweet was accepted to Hofstra University

26  School of Law in New York.  But while high school had come easily to her, she struggled

27  academically in law school.  Datta Rpt. at 6.  To cope, she began abusing her ADHD medications,

28  Adderall and Klonopin.  *Id.*  Her substance abuse issues worsened in New York.  She tried opioids,

1    but did not become addicted at that time.  PSR ¶ 77.  She received her J.D. in May 2014 and took the

2    New York Bar Exam, but did not pass.  PSR ¶ 83.  She then fell into a deep depression and in 2015,

3    moved home to California.  In 2017, she took the California Bar Exam, but again did not pass.  *Id.*

4    This only worsened her depressed state.  In California, Ms. Sweet became addicted to OxyContin.

5    Datta Rpt. at 12.  In part, this was because in California she had access to a drug dealer with a large

6    supply of OxyContin.  PSR at ¶ 79.  As her opioid addiction became more severe, her life quickly

7    spiraled downward to the point where she was taking eight OxyContin pills per day, spending $160 a

8    day to keep up with her addiction.  *Id.*  Ultimately, she was unable to afford OxyContin, and learned

9    to use the dark web to obtain Furanyl-Fentanyl, a much cheaper opioid alternative.  When she was

10   arrested for the instant offense, she was using approximately 1 gram a week.  PSR ¶ 80. As she notes,

11   she does not believe she ever "clinically overdosed," but believes she may have been close once.  *Id.*

12        Ms. Sweet's mental health issues are considerable and longstanding.  Dr. Datta evaluated Ms.

13   Sweet and diagnosed her with Major Depressive Disorder, Generalized Anxiety Disorder, Other

14   Specified Trauma and Stressor Related Disorder, Attention Deficit Hyperactivity Disorder, Opioid

15   Use Disorder, Stimulant Use Disorder, and Benzodiazepine Use Disorder.  *Id.* at 20-21.

16        *The offense*

17        On Mach 1, 2017, Ms. Sweet met an undercover detective on a reddit.com online forum used

18   by opioid addicts.  PSR ¶ 8. The officer posted a comment stating:  "831 looking for a friend."  This

19   was a coded request for opioids.  Ms. Sweet responded and offered to sell the officer Furanyl-

20   Fentanyl.  On March 29, 2017, Ms. Sweet met the undercover officer in a grocery store parking lot

21   and sold him 1 gram of Furanyl-Fentanyl for $170.  PSR ¶ 19. She diluted the .666 gm of 1 gm by

22   placing .333 grams each into two nasal spray bottles containing saline.  She provided the remaining

23   .333 grams in powder form.  As she told the officer, she diluted it because she was concerned about

24   the overdose risk based on her own addiction to Furanyl-Fentanyl.  Ms. Sweet was arrested sometime

25   later on May 9, 2017 without incident.  The total amount of actual Furanyl-Fentanyl Ms. Sweet

26   provided was no more than 1 gram.

27        *Substance Abuse Treatment*

28        Ms. Sweet made her initial appearance on May 10, 2017.  At that time, she was released on

DEFENDANT'S SUBMISSION IN SUPPORT OF CAP REFERRAL
*SWEET*, CR 17–00330 LHK

3

1  bond.  The court did not require that she participate in residential drug treatment.  After the March 29,

2  2017 sale, Ms. Sweet detoxed from her opioid addiction, but later relapsed shortly before her arrest

3  on May 9, 2017.  In May 2017, within days of her release on bond, Ms. Sweet voluntarily entered an

4  income-based six-month residential drug treatment program through New Life Community Services.[1]

5  She completed the six month residential program and lived in a sober living environment for an

6  additional four months.  She has been sober since May 10, 2017 – approximately 15 months.

**ARGUMENT**

7

8  **I.    The Base Offense Level Is Correctly Calculated at 10 not 24**

9          The government objects to the guideline range and calculates Base Offense Level 24.  *See*

10 Objections at Addendum to PSR.  The government argues the weight of the controlled substance is

11 53.6 grams and relies on the DEA Lab report that includes the weight of the saline solution into

12 which Ms. Sweet placed the .666 grams of powdered Furanyl Fentanyl.[2]  The government then

13 arrives at Base Offense Level 24 using 53.6 grams of a mixture or substance containing a detectible

14 amount of Furanyl-Fentanyl. The government's calculation of the weight of the controlled substance

15 is incorrect for several reasons.

16         First, Ms. Sweet was not indicted for, nor did she plead to, an offense involving a mixture or

17 substance.  *See* Indictment, Dkt. No. 7; *see also* 21 U.S.C. § 841(b)(1)(C).  Ms. Sweet stands

18 convicted of distributing a Schedule I controlled substance, and § 841(b)(1)(C) contains no reference

19 to mixture or substance.  *Id.; compare* 21 U.S.C. § 841(b)(1)(C) *with* § (b)(1)(A), (B). Second, under

20 the sentencing guidelines, the government's reliance on mixture or substance is misplaced.  The

21 guidelines provide that "unless otherwise specified, the weight of a controlled substance *set forth* in

22 the table refers to the entire weight of any mixture or substance containing a detective amount of the

23 controlled substance."  USSG § 2D1.1(A).  However, Furanyl-Fentanyl was only recently designated

24 as a Schedule I controlled substance on September 27, 2016, – six months prior to the offense – and

25

26

_____

27 [1] Ms. Sweet participated in the New Life with only nominal financial support from her father, who
   paid the enrollment fee.  Ms. Sweet was estranged from her mother at the time.
28 [2] The government arrives at 53.6 grams by converting the 52.7 ml seized to grams and adding that
   amount to the .333 grams of powder Furanyl Fentanyl also seized. *See* §2D1.1(D)(drug conversation
   tables providing for converting 1gm to 1 ml).

1   is a controlled substance *not set forth* in the table.  Therefore, it is a controlled substance not

2   referenced in the guidelines.  Accordingly, the § 2D1.1(A) mixture and or substance definition does

3   not apply.  Third, and most important, the guidelines provide clear guidance to this Court, instructing

4   that to determine the drug type and quantities, *"[i]n an offense involving an agreement to sell a*

5   *controlled substance, the agreed upon quantity of the controlled substance shall be used to determine*

6   *the offense level*, unless the sale is completed and the amount delivered more accurately reflects the

7   scale of the offense."  *See* USSG § 2D1.1, comment. (n.5) (emphasis added).  Here, the agreed upon

8   quantity was 1 gram of Furanyl-Fentanyl for $170.  There is no evidence Ms. Sweet ever possessed

9   53.6 grams.  Such an amount would have sold for $9,010 – not $170 – and is 4900% more than the

10  actual amount Ms. Sweet agreed to provided.  Additionally, because using the government's

11  proposed 53.6 grams does not more accurately reflect the scale of the offense, it is contrary to note 5.

12  It would instead significantly overstate the offense.  For these reasons, the Court should use the 1

13  gram of Furanyl-Fentanyl Ms. Sweet provided to calculate the guideline range.  Finally, it is clear

14  that each saline solution bottle contained .333 grams each of the 1 gram of Furanyl-Fentanyl.  *See*

15  Defense Exhibit B.  The bottles are clearly marked with the exact amount of Furanyl-Fentanyl each

16  contained.  The saline solution was an inert usable medium; the only active compound was the 1

17  gram of Furanyl-Fentanyl.  The Court should calculate the guideline range based on the clear and

18  convincing evidence of the actual amount of the drug involved.  Accordingly, the court should

19  calculate the guideline range using 1 gm of Furanyl-Fentanyl, which is then converted to its

20  marijuana equivalent of 2.5 kg, resulting in a base offense level of 10.  *See* PSR ¶ 39.

21       However, a further variance or departure is necessary because base offense level 10 is arrived

22  at using the marijuana equivalency for *Fentanyl*, the most closely related substance under the

23  guidelines, and not the less potent *Furanyl-Fentanyl*.  *See* PSR ¶ 39 (using a 2.5 kg marijuana

24  equivalency to arrive at offense level 10).  Even the case agent concedes that Furanyl-Fentanyl less

25  potent than Fentanyl.  *See* PSR ¶ 28. Therefore, a departure or variance to compensate for the inflated

26  offense level for a more potent controlled substance is warranted.  Here, the Court should depart one

27  level to offense level 9 (marijuana equivalency of 1 kg to 2.5 kg) because offense level 10 overstates

28  the seriousness of the offense relative to the actual controlled substance involved.

**II.    The Court Should Refer This Matter to CAP**

Pretrial Services recommends that Ms. Sweet be placed in CAP.  At the outset, the defense notes that the Court has clear authority to place Ms. Sweet in CAP without the government's consent. *See* Defense Exhibit C.  This is in accord with the CAP operating agreement agreed to by the government.  Moreover, CAP only defers Ms. Sweet's sentencing until she successfully completes the program.

Ms. Sweet's request that the court place her in CAP may seem unnecessary, given the advisory guideline range of probation, but her request is sincere.  In weighing this request, the Court should consider, in particular, the need to provide the defendant with correctional treatment.  *See* 18 U.S.C. § 3553(a)(2)(D).  The CAP program is focused on individuals, like Ms. Sweet, whose criminal conduct appears to be motivated by substance abuse issues.  *See* Def. Exh C.  CAP is an intensive drug treatment program designed to address the root cause of criminal conduct associated with substance abuse issues.  Moreover, Ms. Sweet satisfies many of the criteria for eligibility.  Her drug addiction began at an early age, and was a significant, if not the determining, factor motivating her to commit the instant offense.  Although she has no prior criminal convictions or history of arrest, she has a high risk of relapse because of her opioid addiction.  She already voluntarily completed a residential drug program, and more than demonstrated that she is amenable to treatment.  Despite her recent sobriety, her opioid addiction is still in early remission.  She still the in early stages of her recovery.  She is a young woman and has a history of mental illness associated with her substance abuse.  She is a sexual abuse survivor, whose abuse no doubt contributed to her substance abuse issues.  Additionally, as an opioid addict, Ms. Sweet's risk of relapse and death as a result of a relapse is high.  *See* Datta Rpt. at 25 (recommending that Ms. Sweet be prescribed injectable naloxone).  CAP would provide her with the necessary long-term tools to overcome her addiction and become a productive member of the community.  Dr. Datta's treatment recommendations for Ms. Sweet, which includes, among other things, regular group-based treatment to address her opioid abuse disorder, provides further support for a CAP placement.  *See* Datta Rpt. at 24.

Nothing about the offense conduct precludes a CAP referral. The instant offense is not a crime of violence, did not involve credible threats of violence or use of weapon, did not involve a minor,

and is not a sex offense.  Ms. Sweet, like many who have been referred to CAP, is a low-level drug

offender.  In many ways. her offense is demonstrably less severe than the offenses of others admitted

to CAP.  *See, e.g., United States v. Naifarm Saechao*, No. 16-CR-00174 (140-175 month guideline

range for methamphetamine sales); *United States v. Trevor Sands*, No. 15-CR-00017 (41-51 month

guideline range for heroin sales); *United States v. Matthew Hansen*, No. 15-CR-00136 (46-57 months

guideline range for two half pound sales of methamphetamine); *United States v. Lynsey Hartsinck*,

No. 15-CR-00320 (41-51 guideline range and consecutive 24 months for aggravated identity theft);

*United States v. David Cooper*, No. 15-CR-00058 (70-87 months guideline range for sale of

methamphetamine); *United States v. Dereke Gray*, No. 14-CR-00212 (46-57 month guideline range

for cocaine sales); *United States v.  Leah Shelbourne-Turner*, No. 14-CR-216 (charges of wire and

mail fraud as well as aggravated identity theft); *United States v. Damien Mitchell*, No. 15-CR-

00037(10-16 guideline range); *United States v. Holbert Lee*, No. 15-CR-00056 (24-30 month

guideline range); *United States v. Anthony Jackson*, No. 15-CR-00041(two sales totaling 37.8 grams

of methamphetamine); *United States v. Dana Lewis*, No. 15-CR-0004 (sale of 29.4 grams of

methamphetamine); *United States v. Dennis Rumble*, No. 15-CR-00100 (distribution of cocaine base

near a school); *United States v. Marketia Harvey*, No. 15-CR-00100 (distribution of cocaine base

near a school, subject to a 12 month mandatory minimum).  The only distinguishing factor here is

that Ms. Sweet's offense involved Furanyl-Fentanyl.  The type of controlled substance involved in

the offense should not, to the exclusion of all other considerations, preclude CAP.  Furanyl-Fentanyl,

like many opioids, including heroin, is no doubt a dangerous controlled substance.  However, Ms.

Sweet was addicted to it herself.  Her addiction to a deadly opioid that could have easily caused her

own death should lend more support for a CAP placement, not less.  Ms. Sweet would benefit

tremendously from CAP.  The Court should reject the government's request to deny placing Ms.

Sweet to CAP because she was addicted to Furanyl-Fentanyl, as opposed to OxyContin, heroin, crack

cocaine, or methamphetamine.

**III.    The Factors Enumerated in 18 U.S.C. § 3553(a) Support A Sentence of Probation**

It is well-settled that this Court has authority and responsibility to exercise its discretion to

weigh the factors set forth at 18 U.S.C. § 3553(a) to fashion a reasonable and appropriate sentence

1    that comports with the purposes of criminal sentencing. *United States v. Booker,* 543 U.S. 220

2    (2005).  While the Guidelines are to be respectfully considered, they are but one factor among many

3    to be taken into account in arriving at an appropriate sentence. *United States v. Carty*, 520 F.3d 984,

4    991 (9th Cir. 2008) (en banc).  The Court has the independent authority and responsibility to consider

5    all of the factors identified in § 3553(a) and to ensure that the sentence is "sufficient, but not greater

6    than necessary" to serve the goals outlined in subsection (a)(2).  As applied here, if the Court declines

7    to refer Ms. Sweet's case to CAP, it should sentence her to five years' probation.

8              **A.        The Nature and Circumstance of the Offense Support Probation**

9              In sentencing Ms. Sweet, the Court must consider "the nature and circumstances of the

10   offense," and the need to provide "just punishment."  18 U.S.C. § 3553(a)(1).  Ms. Sweet distributed

11   a Schedule I controlled substance – Furanyl-Fentanyl.  The substance was scheduled in late

12   September 2016, and became illegal to possess only six months prior to her arrest.  There are no

13   aggravating factors with respect to the offense, other than the potency of the controlled substance.

14   The offense did not involve a large quantity of Furanyl-Fentanyl, violence, threats of violence, or

15   firearms or weapons of any kind.  Ms. Sweet was arrested without incident and readily confessed.

16   Ms. Sweet understands that Furanyl-Fentanyl is a deadly opioid.  It was a drug she herself abused.

17   However, the instant offense did not involve the more potent *Fentanyl*.  While Furanyl-Fentanyl is a

18   no doubt a potent opioid, it is unquestionably less potent that Fentanyl.  Also, this factor is somewhat

19   mitigated because the only reason Ms. Sweet distributed Furanyl-Fentanyl was because she was

20   addicted to it herself.  She used the substance because it was a cheaper and stronger opioid that

21   helped her avoid painful withdrawal symptoms associated with her own opioid addiction.

22             **B.        Ms. Sweet's History and Characteristics Support a Sentence of Probation**

23             Ms. Sweet's personal history and characteristics are factors for the Court to consider in

24   fashioning a fair and just sentence. *See* 18 U.S.C. § 3553(a)(1).  Her youth, her history of trauma and

25   abuse, her history of substance abuse, her post-offense rehabilitation, and her mental health issues all

26   support a decision to impose probation.

27

28

1

2

### 1.  Ms. Sweet's Youth and Her Traumatic Childhood Support a Sentence of Probation

Ms. Sweet was 27 years old when she committed the offense.  Sentencing courts have the discretion to consider a host of factors, including the defendant's age.  *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005). While she was not in her early twenties, she was still a relatively young woman, and her youth is a mitigating factor.  On the surface she has lived a fortunate life, which she acknowledges.  However, in truth her life has been marked by profound personal trauma, and private struggles with addiction and mental health issues since she was a teenager.  She was raped as a teenager and she was raised in a dysfunctional home.  Rape is unquestionably abuse, and "it requires no citation to authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible citizens." *Santosky v. Kramer*, 455 U.S. 745, 789 (1982).  Her mother abused alcohol, and her grandmother, with whom she was the closest, also struggled with addiction.  The roots of her drug addiction are no doubt related to the alcoholism she witnessed.  Sadly, Ms. Sweet later became an addict herself.  She is a bright and capable woman with incredible potential. She is a brilliant and thoughtful writer.  She has the support of her family and friends.  *See* Def. Exh D., Letters of Support.  As they note, she is deeply ashamed and remorseful for her crime.  *Id.*  She is a law school graduate who had hoped someday to be admitted to the bar. However, she is now a convicted felon and may possibly never be admitted to any bar and or professional organization. This is a lasting collateral punitive consequence of her conduct.

### 2.  Ms. Sweet's Substance Abuse History Supports a Sentence of Probation

Mr. Sweet's addiction to Furanyl-Fentanyl and decades-long struggle with substance abuse is a further mitigating factor, with respect to her personal history and characteristics, as well as her state of mind when she committed the offense.  District courts are permitted to consider a defendant's drug addiction, *see United States v. Garcia*, 497 F.3d 964, 972 (9th Cir. 2007), and drug addiction can provide grounds for a variance, even from the career offender guidelines, *see, e.g., United States v. Gavin*, 2008 WL 4418932 (E.D. Ark. Sept. 29, 2008) (granting downward variance in part because "defendant's criminal history reflects criminal behavior consistent with a vagrant and substance abuser as opposed to a violent offender"); *United States v. Serrano*, 2005 WL 1214314 (S.D.N.Y. May 19, 2005) (imposing a below guideline sentence based, in part, on the fact that the defendant's

offense stemmed from his drug addiction).  Ms. Sweet started drinking at age 13 and began heavily

abusing alcohol in high school.  In high school and college she began to abuse her ADHD medication

and became a poly-substance abuser, including opioid abuse. She transitioned to being a full-blown

opioid addict in 2015, using eight or more OxyContin pills per day.  At the time of the offense, she

was using 1 gram of Furanyl-Fentanyl a week.  While her drug addiction cannot excuse or justify Ms.

Sweet's conduct, it does offer significant insight into her motive to commit the offense and it

provides reason to believe that her sentence should address the need for treatment, not just

punishment.

### 3.     Ms. Sweet's Extraordinary Post-Offense Rehabilitation and Completion of the Conviction Alternative Program Supports a Sentence of Probation

Post-offense rehabilitation has always been a recognized basis for a downward departure.  *See,*

*e.g., United States v. Tzoc-Sierra*, 387 F.3d 978 (9th Cir. 2004).  Similarly, post-offense rehabilitation

can be the basis for a downward variance.  In this regard, the numerous letters written in support of

Ms. Sweet speak for themselves.  *See* Def. Exh D.  Ms. Sweet has been sober since her arrest on May

9, 2017.  She voluntarily participated in, and successfully completed, a residential drug treatment

program.  She later transitioned to a sober living environment.  Significantly, all of this was done

voluntarily.  Despite her young age, she has struggled with opioid addiction for several years. She

will no doubt struggle to overcome her addiction for the rest of her life.  Her insight into her

addiction is sad, impressive, and sincere.  *See* Datta Rpt. at 15.  Her post-offense rehabilitation to date

is a significant factor that supports probation.

### 4.     Ms. Sweet's Mental Health Issues Support a Sentence of Probation

The Court may grant variance based on a defendant's "mental and emotional condition."

*Ameline*, 409 F.3d at 1093; *see also United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993).

There is factual and legal support for such a departure on this basis as well.  *See Untied States v.*

*Chritensen*, 18 F.3d 882 (9th Cir. 1994).  Here, Ms. Sweet's mental and emotional condition during

the offense support a sentence of probation.  During the offense, she was clearly suffering from a

reduced mental capacity because of her severe opioid use disorder.  *See* Dr. Datta Report at 21.  As

Dr. Datta concludes, "*Ms. Sweet's conduct in the instant offense would not have occurred but for her*

1   *server opioid use disorder*, which was the end point of her untreated and undertreated severe anxiety

2   disorders." *Id.* (emphasis added).  Even prior to *Booker*, courts were permitted to depart downward

3   in cases in which the defendant suffered from a significantly reduced mental capacity.  *See* USSG §

4   5K2.13; *see also Cantu*, 12 F.3d at 1509.  The intent behind § 5K2.13 was to "treat with some

5   compassion those in whom a reduced mental capacity has contributed to the commission of a crime."

6   *Cantu*, 12 F.3d at 1511.  This same goal should be taken into consideration when deciding whether to

7   sentence Ms. Sweet to probation.  Dr. Datta's report provides clear and compelling support for a

8   probationary sentence.  As Dr. Datta notes, Ms. Sweet suffers from no less than seven mental

9   disorders that contributed to her offense conduct. They include Major Depressive Disorder,

10  Recurrent, Current Episode of Moderate Severity; Generalized Anxiety Disorder; Other Specified

11  Trauma and Stressor Related Disorder; Attention Deficit Hyperactivity Disorder, Combined Type;

12  Opioid Use Disorder, Severe, in Early Remission;  Stimulant Use Disorder, Moderate, in Early

13  Remission; and Benzodiazepine Use Disorder, Mild, in Early Remission.  Ms. Sweet's untreated

14  mental health issues during the offense were considerable and support a probationary sentence.

15  **IV.    Probation is a Meaningful Punishment**

16           In this case, a sentence of five years' probation is not insignificant.  It would provide sufficient

17  punishment and deter Ms. Sweet from reoffending, while providing her with substance abuse

18  treatment and mental health counseling. The latter components would assist greatly in mitigating the

19  risk of recidivism.  As the sentencing court in *Gall* observed, "probation, rather than 'an act of

20  leniency,' is a 'substantial restriction of freedom.'"  *Gall v. United States*, 552 U.S. 38, 44 (2007).

21  The sentencing court went on to explain:

22           "[The defendant] will have to comply with strict reporting conditions along with a
         three-year regime of alcohol and drug testing.  He will not be able to change or make
23       decisions about significant circumstances in his life, such as where to live or work,
         which are prized liberty interests, without first seeking authorization from his Probation
24       Officer or, perhaps, even the Court.  Of course, the Defendant always faces the harsh
         consequences that await if he violates the conditions of his probationary term."
25

26  *Id.*

27           The Supreme Court concurred, noting that probationers are "subject to several standard

28  conditions that substantially restrict their liberty."  *Id.* at 48.  Probation would be particularly

1   appropriate for Ms. Sweet, if the court declines to place her in CAP.  She is in clear need of continued

2   support within the community to maintain her sobriety, which is at the core of her risk to recidivate.

3   Five years would be a significant restriction on her liberty.  Probation is a sufficient, but not greater

4   than necessary, punishment.

5                                              **CONCLUSION**

6          For the reasons set forth above, defendant Ms. Sweet respectfully requests that the Court refer

7   her case to the CAP program, or in the alternative, sentence her to no more than 5 years of probation.

8   Such a sentence is sufficient, but not more than necessary, to comport with the goals of sentencing for

9   this particular defendant.

10

11

12   Dated:      August 15, 2018                            Respectfully submitted,

13                                                          STEVEN G. KALAR
                                                            Federal Public Defender
14                                                          Northern District of California

15                                                                    /S
                                                            _____
16                                                          VARELL FULLER
                                                            Assistant Federal Public Defender

17

18

19

20

21

22

23

24

25

26

27

28