ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JEFFREY A. BACKHUS (CABN 200177)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5080
    FAX: (408) 535-5066
    jeffrey.backhus@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>MADELINE MORGAN SWEET,<br><br>    Defendant. | Case No. CR 17-00330 LHK<br><br>GOVERNMENT'S CAP OPPOSITION AND SENTENCING MEMORANDUM<br><br>Sentencing Date:  August 22, 2018<br>Time:  9:15 a.m. |

TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................................1

II.  FACTS ....................................................................................................................................1

III. CAP is Best Used to Benefit Those Who Are Not Already in Post-Treatment Remission ..............................................................................................................................5

IV.  Defendant's Role in the Offense Should be Considered When Determining CAP Eligibility ...............................................................................................................................6

V.   The Government Recommends a Sentence of 30 Months of Imprisonment. ......................7

    A.   Government's Guidelines Calculations .......................................................................8

    B.   The Court Should Sentence the Defendant to 30 Months of Imprisonment. .............9

# TABLE OF AUTHORITIES

**Federal Cases**

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .................................................................. 9

**Federal Statutes**

18 U.S.C. § 3553(a)(1) .................................................................................................................. 9

21 U.S.C. § 841(b) ........................................................................................................................ 8

**Federal Rules**

U.S.S.G. § 5C1.2(a)(1)-(4) ............................................................................................................ 9

U.S.S.G. § 5C1.2(a)(1)(5) ............................................................................................................. 9

**Other Authorities**

*Still Searching for the Tzutzu Flower: Cautions Against Extending the Federal Analogue Act of 1986*, 27 U. Fla. J.L. & Pub. Pol'y 111 (2016) ................................................................... 10, 11

## I.  INTRODUCTION

The instant memorandum addresses the government's position regarding Madeline Sweet's ("defendant') enrollment in the Conviction Alternatives Program ("CAP") as well as the government's sentencing recommendation.  As discussed herein, the government opposes the defendant's admission into the CAP program because of her role in this offense and because she is not a "target participants for Diversion/Deferred Sentencing Court" as outlined in the CAP Operating Agreement.  If the Court agrees with the government and does not refer the defendant to CAP, then the government recommends a sentence of 30 months of imprisonment, which is the low-end of the Guidelines range calculated by the government.  The government respectfully disagrees with the Guidelines range calculated by Probation.

## II.  FACTS

This case arises out of an investigation initiated by the Monterey County Sheriff's Office (MCSO) who provided information to the Drug Enforcement Administration (DEA) relating to MCSO who are investigating the drug trafficking activities of the defendant.

Beginning in September 2016, an undercover police officer ("UC") from the MCSO began investigating the sale of narcotics through a website called Reddit (www.reddit.com).  As described below, the defendant has used the Reddit web page and associated user information to sell drugs and communicate with customers.  Reddit is a social news aggregation, web content rating, and discussion website.  Reddit's registered community members can submit content, such as text posts or direct links. Registered users can then vote submissions up and down to organize the posts and determine their position on the site's pages.  The submissions with the most positive votes appear on the front page or the top of the category.  Content entries are organized by areas of interest called "subreddits".

In the month of November 2016, the UC discovered numerous subreddits whose primary purpose is to facilitate the sales of narcotics.  These subreddits are further broken down into individual "threads."  While monitoring different California threads, the UC began to realize that users on these narcotics based "subreddits" refer to narcotics dealers as "friends."  When a user is involved in the sales of narcotics, they will advertise they are a "friend."  When users are seeking an individual to purchase narcotics from they will post they are "looking for a friend."  The two parties will then communicate via private messages to confirm the specifics of the narcotics transaction.

On March 1, 2017, the UC created an account on www.reddit.com named 'throawaythroaway123'. On March 03, 2017, the UC used this account to post a comment in the 'California – March' thread of the opiate subreddit stating "831 looking for a friend!!". An account named 'imokoffthat' replied to the comment stating "can help in 831". Moments later, the UC's www.reddit.com account received a private message from the same (imokoffthat) account advertising the sales of Furanyl-Fentanyl, a Schedule I controlled substance, in the Monterey area.

The person using the moniker 'imokoffthat' went on to detail how, because of the high potency of Furanyl-Fentanyl, they custom manufacture a nasal-spray applicator to ingest the substance. The user of 'imokoffthat' went on to advise the UC that the user of 'imokoffthat' would tailor the concentration of Furanyl-Fentanyl to the UC's specific tolerance to opiates. Eventually, the UC provided the user of 'imokoffthat' with a phone number and the UC requested they send the UC a text message. Shortly thereafter, the UC received a text message on his cell phone from a (831) 917-8524 number. The text message identified the sender as a "Maddie".

The UC conducted a records check for that phone number and located a Police Report taken by Monterey Police Department in July of 2016 for a Drug-D.U.I. The police identified the defendant as the suspect in that case.

The DEA issued an administrative subpoena to Cellco/Verizon and learned that the subscriber for (831) 917-8524 was Mary Sweet in Pacific Grove, California.

The UC continued to text the defendant throughout the evening and eventually the defendant offered to provide the UC with a 10mg-10ml solution of Furanyl-Fentanyl in a 30ml nasal-spray bottle for $50. The defendant also offered to "throw in" an extra 30mg of Furanyl-Fentanyl powder.

The UC and the defendant ultimately agreed to conduct the transaction the following Tuesday, at a location near downtown Pacific Grove. However, due to administrative issues, the UC had to cancel the narcotics purchase. The defendant then began to suspect she was texting a law enforcement officer and asked the UC to "friend" her on Facebook in order to prove the UC was "not a cop." The UC advised the defendant he did not have a Facebook account. The defendant then sent the UC links to numerous social media websites, asking the UC to friend her on any of them. Several of the links contained a picture of a woman later identified as the defendant.

The UC advised the defendant that he did not feel comfortable friending her on Social Media since the UC claimed he did not know whether she was an undercover law enforcement officer. The UC then stopped texting the defendant for a short period.

On March 9, 2017, the UC texted the defendant again asking if she still had a "bottle," referring to the nasal spray bottle containing Furanyl-Fentanyl. The defendant advised the UC she did not, since she had sold all of it already. At the end of conversation, the defendant stated she would advise the UC when she would have any fentanyl for sale again.

On March 10, 2017, the defendant sent the UC a text message advising she had "ordered more." On March 13, 2017, the UC texted the defendant inquiring if "anything had changed." The defendant advised the UC "They haven't sent me tracking yet" and that "its shipped from the NL." The UC understood "NL" to mean the Netherlands.

On March 22, 2017, the UC texted the defendant asking, "Hey, how's it going?" the defendant advised the UC the shipment was going through customs in San Francisco.

On March 27, 2017, the defendant advised the UC she had received a shipment of Furanyl-Fentanyl. She advised the UC she had "25 people legit blowing up my inbox," the UC understood that to mean she had numerous people attempting to purchase narcotics from her. The defendant texted the UC a "price sheet." The "price sheet" listed the following amounts of fentanyl and the corresponding costs:

    1g = $150

    500mg = $75

    400mg = $65

    300mg = $55

    200mg = $44

    100mg = $30

The UC replied to the defendant requesting 1 gram of Furanyl-Fentanyl. the defendant advised the UC that would require three bottles, each bottle costing another $10. The UC asked the defendant if she could just "do" two bottles. The defendant agreed, stating she would package the remaining third in a "stealthy as fuck container."

The defendant and the UC agreed to conduct the narcotics transaction in the parking lot of the Nob Hill store in Pacific Grove (located at 900 Lighthouse Ave, Monterey, CA 93940) on March 29, 2017, at 11:00 a.m.  The defendant advised the UC that she might send her boyfriend (later identified as Everett Reed (hereafter "Reed") to conduct the transaction.

Once at the parking lot, the UC and surveillance officers observed the defendant exit the passenger side door of a 2000 dark green, Chevrolet Metro, registered to Reed.  An individual later identified as Reed had driven the Chevrolet Metro to the meeting location and waited in the vehicle as the defendant met with the UC.  Once the defendant got out of the Chevrolet Metro, she walked to the UC's vehicle, which was parked nearby, and entered the passenger side.

The defendant met with the UC in the UC's vehicle and spoke about the sale and the proper dosage amounts for drug so that the UC would not overdose.  The defendant expressed concerns about the UC overdosing which appeared to demonstrate her knowledge of how dangerous the drug was.  The defendant then provided the UC with one gram of powdered fentanyl, which included two pre-mixed droppers of solution.  Initially, the UC gave the defendant a total of $180.  The defendant then got out of the UC's vehicle and returned to Reed's vehicle to see if he had $10 in change to give back to the UC.  Ultimately, the UC allowed the defendant to keep the extra $10 after Reed was unable to offer change to Madeleine Sweet.  Madeleine Sweet and the UC agreed the additional $10 would count toward a future drug transaction.

Subsequent laboratory testing of the fentanyl determined that the substance that the defendant sold to the UC consisted of 53.607 net grams of N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2carboxamide (furanyl fentanyl), a Schedule I controlled substance.  The substance also contained a trace amount of methamphetamine.

On April 18, 2017, the UC made contact with the defendant who advised the UC she was expecting another shipment of fentanyl at the "end of the week."

On April 19, 2017, the UC contacted the defendant via text message to her phone.  The defendant responded with a test message stating that she was in South Lake Tahoe for a week but wanted to know how many the UC wanted.  The UC clarified he was inquiring about fentanyl and the defendant advised "it's on it's way!!!"  The defendant went on to say that she and her boyfriend (Reed)

like to take a break from "opes" (presumably opiates) and that the defendant "just like to maintain my ability to use recreationally and when I feel myself slipping into the maintenance mode of opiate usage (like using every day just not to WD) I like to force myself to take a tolerance break lol".  The defendant then inquired as to how long that "fuf last you? It's intense ya?"  The government believes that the defendant was referring to the previous fentanyl transaction she made with the UC.

On April 26, 2017, the UC sent a text message to the defendant on her phone, which stated, "Hey maddie! Just wanted to make sure you haven't forgotten about me yet lol."  Sweet "nope!!! Sorry still in south lake tahoe! ill hit u up as soon as I'm home."

On May 1, 2017, the UC sent a text message to the defendant on her phone, which stated, "Heyyy. Hope all is well. Was just curious if you had any idea when you'd be back in town?? Just wondering if I should go ahead and try and put in an order myself?"

On May 6, 2017, the defendant responded via her phone "sorry for the delay. I should have some by Monday if you still want it".

On May 8, 2017, a registered mail envelope addressed to the defendant was seized by investigators and later opened after a search warrant was obtained.  The package contained a white powdery substance consistent with fentanyl.  The substance was transferred to the DEA Western Regional Laboratory where test results are pending.

On May 9, 2017, surveillance was established in the area of the Pacific Grove, U.S. Post Office in anticipation of the defendant picking up the package of suspected fentanyl.  Ultimately, Reed and the defendant arrived at the post office in Reed's vehicle.  Reed entered the Post Office and signed for a faux package labeled and designed similarly to the original package which was seized.  The defendant was arrested pursuant to a federal arrest warrant obtained during the investigation and Reed was detained.

**III.    CAP is Best Used to Benefit Those Who Are Not Already in Post-Treatment Remission**

Defendant's role in the offense should disqualify her from CAP eligibility, as explained infra in Part IV of this Memorandum.  To the extent the Court is not persuaded of defendant's ineligibility, the Court should consider how defendant might benefit from CAP, given that she has already completed a residential treatment program, tested drug-free for almost 15 months, and is currently employed.  More

importantly, consideration should be given to the CAP-eligible candidate who will not earn a place in CAP because defendant has taken one of the limited spaces in the program.

The CAP Operating Agreement makes clear that the "target participants for Diversion/Deferred Sentencing Court are defendants with [certain] risk factors who would benefit from effective intervention to address their risk factors and challenges. The program may include substance abuse and mental health treatment, education and literacy training, and employment and job skills training." *Ex. 1 at p. 2, CAP Operating Agreement Attachment B*. In the instant case, defendant has already undergone substance abuse and mental health treatment, is already employed and has both a Bachelor of Arts Degree in political science and French Studies, as well as Juris Doctorate degree. Moreover, defendant has been on this path of improvement since her pretrial release in May of 2017, more than a year ago. As noted in the CAP Operating Agreement, "[o]nce successful behavior has been achieved for at least 12 months, empirical data suggests that the change is well-integrated and will be supported." *Id*. Simply put, it is unclear how defendant would further improve from CAP given her seemingly perfect record of remission over a one-year period.

The most important consideration, however, is not how defendant will benefit from CAP, but how defendant's admission will work to another candidate's detriment. CAP offers a very limited number of placements and, once full, other deserving defendants who might have benefitted from the program will be turned away. It behooves the Court and the community to reserve CAP placements for those candidates who have not yet begun the path to treatment and who might need the more intense structure of CAP to succeed in their first 12 months of recovery. In this way, CAP's limited resources will maximize its impact on the greatest number of defendants.

**IV.    Defendant's Role in the Offense Should be Considered When Determining CAP Eligibility**

Section 3.1 of the CAP FAQs specifically provides that defendants are generally excluded from participation in CAP where the "instant offense involves more than [a] minor role in either large-scale fraud or large-scale narcotics distribution." Ex. 2, *CAP FAQ Section 3.1*. The government does NOT contend that the defendant was involved in large-scale narcotics distribution or that the defendant is explicitly disqualified from CAP eligibility. However, the government does believe that the Court should consider the defendant's role in the offense and the fact that she was selling a substance that she

knew could lead to overdose and/or death.

Here, the defendant was at the center of her Furanyl-Fentanyl distribution business and utilized sophisticated online tools to both market narcotics and to obtain them from overseas suppliers. She defendant also had multiple customers for the narcotics. For example, on March 27, 2017, the defendant told the UC that she had "25 people legit blowing up [her] inbox," which the UC understood to mean she had numerous people attempting to purchase narcotics from her. The defendant even had a "price sheet," that she would sent to potential customers. Defendant was not a low-level participant in her scheme.

Moreover, the defendant knew how dangerous the narcotics she was selling actually were. When the defendant met with the UC in the UC's vehicle and spoke about the sale and the proper dosage amounts for drug so that the UC would not overdose. The defendant expressed concerns about the UC overdosing which appeared to demonstrate her knowledge of how dangerous the drug was. Prior to the transaction, when the UC and the defendant were still chatting on Reddit, the defendant detailed how, because of the high potency of Furanyl-Fentanyl, they custom manufacture a nasal-spray applicator to ingest the substance. The defendant went on to advise the UC that the she would tailor the concentration of Furanyl-Fentanyl to the UC's specific tolerance to opiates. Clearly, the defendant knew of the risks of overdose and/or death, but continued to sell the drug regardless of those risks.

For all these reasons, the government respectfully requests that the Court deny defendant's request for admission to CAP.

**V.     The Government Recommends a Sentence of 30 Months of Imprisonment.**

As the government stated in its objections to the PSR, the government believes that the base offense level should be 24 based on 53.6 grams of Furanyl-Fentanyl. Admittedly, the Furanyl-Fentanyl guidelines are a bit uncertain. In fact, Furanyl-Fentanyl is not mentioned anywhere in 2D1.1, including in the drug equivalency tables. However, fentanyl and fentanyl analogues are mentioned. If we were to utilize the fentanyl guidelines, the base offense level for 53.607 grams of fentanyl is 24 (at least 40 grams but less than 160 grams of fentanyl). If we were to use the fentanyl analogue guidelines, the base offense level would be 26 (at least 40 grams but less than 70 grams of a fentanyl analogue). Accordingly, pursuant to USSG §2D1.1, Commentary Note 6, Furanyl Fentanyl must be treated as a

controlled substance not specifically referenced in the guidelines.  Based on the known information, Fentanyl is the most closely related substance and, as a result, the lower base offense level of 24 would apply.

In addition, the government disagrees with Probation's citation to USSG §2D1.1, Commentary Note 5, and corresponding decision to utilize one gram of Furanyl-Fentanyl to determine the Base Offense level.  Pursuant to USSG §2D1.1, Note (A), the weight of a controlled substance "refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."  USSG §2D1.1, Commentary Note 1, states that, "[m]ixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used."  Here, because of the high potency of Furanyl-Fentanyl, the defendant custom manufactures a nasal-spray applicator containing the Furanyl-Fentanyl and a saline solution.  The user then ingests the entire mixture or substance.  This is not like the other examples in USSG §2D1.1, Commentary Note 1, such as a cocaine/beeswax statue the impregnated wax is not consumable so you do not use the full mixture/substance weight because it is misleading.  Here, the Furanyl-Fentanyl/saline solution was ready to be consumed.  Accordingly, the full mixture and substance weight should count.  See 21 U.S.C. § 841(b); USSG §2D1.1, Note (A).

Moreover, utilizing the 53.6-gram weight of the mixture or substance containing Furanyl-Fentanyl (with a trace amount of methamphetamine) does not over represent the seriousness of the offense.  Although the defendant only completed one sale to the UC, she claimed to have as many as 25 people waiting to buy drugs from her.  In addition, when she was arrested, the defendant was in the process of obtaining more Furanyl-Fentanyl to sell to the UC.  Accordingly, holding the defendant responsible for only one gram of Fentanyl significantly underrepresents the seriousness of the offense.  In addition, while in law school, the defendant worked for the Kings County District Attorney's Office, for the United States Attorney's Office for the Eastern District of New York, and as a judicial intern for a superior court judge Bronx Supreme Court, in New York.  With those experiences, the defendant must have known what terrible effects the drugs she was selling could have on people.  The defendant knew of the risks of overdose and/or death, but continued to sell Furanyl-Fentanyl regardless of those risks.

### A.  Government's Guidelines Calculations

The government calculates defendant's Guidelines range as follows:

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(8):<br>(at least 40 grams but less than 160 grams of fentanyl) | 24 |
| b. | Amount of Drugs:<br><br>Fentanyl (mixture or substance) | 53.6 grams |
| c. | Safety valve:<br>(If Probation finds that I meet the requirements of<br>U.S.S.G. § 5C1.2(a)(1)-(4) and the Government finds<br>that I have truthfully debriefed with them within the<br>meaning of § 5C1.2(a)(1)(5).) | -2 |
| d. | Acceptance of Responsibility:  If Defendant meets the requirements<br>of U.S.S.G. § 3E1.1, she may be entitled to a three-level reduction<br>for acceptance of responsibility, provided that she forthrightly<br>admits her guilt, cooperates with the Court and the Probation<br>Office in any presentence investigation ordered by the Court,<br>and continue to manifest an acceptance of responsibility through<br>and including the time of sentencing. | -3 |
| e. | Adjusted Offense Level: | 19 |

Because the defendant has a criminal history category of I, her Guidelines range is 30-37 months.

**B.     The Court Should Sentence the Defendant to 30 Months of Imprisonment.**

Section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence. In this case, these factors indicate that a low-end Guidelines sentence of 30 months is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See* United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008). The key factors are the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to afford adequate deterrence to criminal conduct, id. § 3553(a)(2)(B), the need to protect the public from further crimes of the defendant, id. § 3553(a)(2)(C), and the need to provide the defendant with needed medical care or other treatment. Id. § 3553(a)(2)(D).

The heroin and opioid crisis is a cancer that has grown and metastasized in the body politic of the United States. Heroin, opioids and synthetic opioids such as fentanyl are different from other addictive substances. The principal difference lies in the fact that recreational use is too often deadly. The

questionable level of potency in each dose of heroin frequently causes overdose.  *See* Audrey Redford, Still Searching for the Tzutzu Flower: Cautions Against Extending the Federal Analogue Act of 1986, 27 U. Fla. J.L. & Pub. Pol'y 111, 119 (2016) (stating some heroin overdoses occur because the varying presence of fentanyl renders users unaware of the drug's true potency).  All too often news stories emerge of "bad batches" that cause a deluge of fatal overdoses.  *See, e.g.*, Steve Birr, "Bad Batch" of Heroin Sparks Five Overdoses in Four Hours, The Daily Caller News Found (Dec. 28, 2016, 3:08 PM), http://dailycaller.com/2016/12/28/bad-batch-of-heroin-sparks-five-overdoses-in-four-hours/; Carolyn Blackburne, "Bad Batch" of Heroin is Causing Record Amount of Overdoses in Washington County, http://www.your4state.com/news/news/bad-batch-of-heroin-is-causing-record-amount-of-overdoses-in-washington-county (last visited June 23, 2017). Jeremy Gorner et al., 74 Overdoses in 72 Hours-Laced Heroin May Be to Blame, Chi. Trib. (Oct. 2, 2015, 10:11 PM), http://www.chicagotribune.com/news/local/breaking/ct-heroin-overdoses-met-20151002-story.html. Furthermore, users develop a tolerance over time and, as a result, seek out the highest potency possible without regard to the related risk of death.  The Centers for Disease Control and Prevention ("CDC") found that between 2012 and 2014, heroin caused the most overdose deaths of any drug.  See Margaret Warner et al., Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2010-2014, 65 Nat'l Vital Stats. Reps., no. 10, Dec. 20, 2016, at 1, 4, https://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr6510.pdf.

In addition to heroin, there is a surge in the popularity of fentanyl[1] and other powerful synthetic

---

[1] Fentanyl is an extremely powerful synthetic opioid.  It was originally introduced as an intravenous anesthetic in the 1960s. U.S. Dep't of Justice & Drug Enf't Admin. Diversion Control Div., Fentanyl (2016), http://www.deadiversion.usdoj.gov/drug_chem_info/fentanyl.pdf. Today, those with otherwise untreatable pain, such as terminal cancer patients, use fentanyl for pain management.  *Id*. Fentanyl is 100 times more potent than morphine as an analgesic. *Id*.; *see also* David Armstrong, "Truly Terrifying": Chinese Suppliers Flood US and Canada with Deadly Fentanyl, STAT News (Apr. 5, 2016), https://www.statnews.com/2016/04/05/fentanyl-traced-to-china/. For opioid dependent individuals, fentanyl can serve as a direct substitute for heroin. U.S. Dep't of Justice & Drug Enf't Admin. Diversion Control Div., supra.  However, because it is much more potent than heroin, fentanyl is a very dangerous replacement.  *Id*. Fentanyl's use results in frequent overdoses, which can cause respiratory depression and death.  *Id*. Additionally, because fentanyl can be absorbed through the skin in some forms, fentanyl can be deadly if touched.  *Id*.; see also FENTANYL: Incapacitating Agent, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/niosh/ershdb/EmergencyResponseCard_2975_0022.html (last updated May 19, 2017) (detailing necessary skin protection for handling fentanyl).

The DEA released a safety video to law enforcement agencies nationwide warning officers not to

opioids such as Furanyl-Fentanyl.  The DEA estimates that "[a]bout two milligrams of fentanyl—about what comes out with a single jiggle of a salt shaker—is considered lethal." Lynh Bui & Peter Hermann, Elephant Tranquilizer is the Latest Lethal Addition to the Heroin Epidemic, Wash. Post (Apr. 26, 2017), http://wapo.st/2qcJqP1?tid=ss_tw&utm_term=.e179c3d288ca; *see also* DEA Issues Carfentanil Warning to Police and Public, U.S. Drug Enforcement Admin. (Sept. 22, 2016), https://www.dea.gov/divisions/hq/2016/hq092216.shtml (noting that fentanyl can "be lethal at the 2-milligram range, depending on route of administration and other factors" and that "[t]he dosage of fentanyl is a microgram, one millionth of a gram—similar to just a few granules of table salt").  Fentanyl and synthetic opioids are particularly dangerous because they can be—and often are—mixed with other drugs without the consumer's knowledge.  *See* DEA Issues Carfentanil Warning to Police and Public, supra note 25 ("Fentanyl, a synthetic opiate painkiller, is being mixed with heroin to increase its potency, but dealers and buyers may not know exactly what they are selling or ingesting. Many users underestimate the potency of fentanyl.").[2]  The national overdose death rate from synthetic opioids increased 72.2% from 2014 to 2015.  *See* Synthetic Opioid Data, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/drugoverdose/data/fentanyl.html (select "Synthetic Opioids Data" tab) (last updated Dec. 16, 2016); *see also* Rose A. Rudd et al., Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010-2015, 65 Morbidity & Mortality Wkly. Rep. 1445, 1446 (2016). News reports have linked fentanyl to least 130 deaths in the Bay Area alone since 2015, based on a survey of records from nine Bay Area counties.  *See* NBC Bay Area, Fentanyl Linked to At Least 130 Bay Area Deaths Since 2015, available at http://www.nbcbayarea.com/news/local/Unsuspecting-Users-Are-Dying-as-Killer-Drug-Surges-in-Bay-Area-422443823.html.

Other dangerous opioids are being developed in order to meet growing demand.  An example is Furanyl-Fentanyl, the synthetic designer opioid at issue in this case.  Not much research has been done

---

touch suspected fentanyl and not to test it in the field.  The Justice Dep't, Roll Call Video Warns About Dangers of Fentanyl Exposure, YouTube (June 7, 2017), https://www.youtube.com/watch?v=8MLsrleGLSw.  The DEA made the video in response to an incident where two police officers in New Jersey nearly died after accidentally inhaling a whiff of fentanyl while bagging it for evidence.  *Id*.

[2] In this case, there were trace amounts of methamphetamine in the substance that the defendant sold the UC.

on Furanyl-Fentanyl, because it is not used medically.  According to the DEA, it is being sold a "research chemical."  However, the government has spoken to DEA chemists who stated that Furanyl-Fentanyl is very similar in effect and potency to fentanyl.  Potency is 50 to 100 times more powerful than morphine and it is dosed in micrograms, not milligrams or grams.  Bottom line is that it is very dangerous.  In this case, laboratory analysis confirmed that the substance that the defendant sold to the UC consisted of 53.607 net grams of N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2carboxamide (Furanyl-Fentanyl), a Schedule I controlled substance.

As stated above, the defendant knew she was selling Furanyl-Fentanyl, and she knew how dangerous the substance was.  The defendant stressed the proper dosage amounts for drug so that the UC would not overdose.  The defendant went on to advise the UC that the she would tailor the concentration of Furanyl-Fentanyl to the UC's specific tolerance to opiates.  Clearly, the defendant knew of the risks of overdose and/or death, but continued to sell the drug regardless of those risks.

As far as the defendant's history and characteristics, she had a self-described "really good" childhood and never suffered any abuse or neglect.  PSR ¶ 59.  By all accounts, the defendant enjoyed an upper-middle class upbringing and was able to graduate from college and law school.  PSR ¶ 83.  The defendant has suffered from drug and alcohol addiction beginning in her teenage years and continuing until her arrest for the instant offense.  PSR ¶¶ 76-81.  The defendant had a very unhealthy relationship with her mother, but did have a relationship with her father.  PSR ¶¶ 61, 67.  The defendant has also been diagnosed with several mental and emotional disorders.  PSR ¶¶ 72-75.

The government believes that the aggravating and mitigating factors cancel each other out and that the defendant should be sentenced within the applicable Guidelines range.  Accordingly, the government recommends that the Court sentence the defendant to 30 months of imprisonment followed by a five-year term of supervised release with the conditions recommended by probation.

DATED: August 15, 2018                    Respectfully submitted,

                                          ALEX G. TSE
                                          United States Attorney

                                               /s/
                                          JEFFREY A. BACKHUS
                                          Assistant United States Attorney